

**SO ORDERED.**

**SIGNED this 03 day of December, 2008.**

*Dale L. Somers*
Dale L. Somers
UNITED STATES BANKRUPTCY JUDGE

_____

Opinion Designated for Electronic Use, But Not for Print Publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re:<br><br>LINDA ANN CHARLTON,<br><br>                        DEBTOR. | CASE NO. 07-22136-13<br>CHAPTER 13 |

**OPINION DETERMINING DEBTOR'S OBLIGATION TO HER EX-SPOUSE IS NOT A DOMESTIC SUPPORT OBLIGATION, AND DIRECTING CLERK'S OFFICE TO SET THIS CASE ON THE NEXT CONFIRMATION DOCKET**

This matter is before the Court for decision following an August 27, 2008, evidentiary hearing on the Debtor's objection to a claim filed by her ex-husband. Debtor Linda Charlton ("Linda") appeared in person and by counsel Maurice B. Soltz. The Debtor's ex-husband, Chris Charlton ("Chris"), appeared pro se. There were no other appearances. The Court is now ready to rule.

Chris argues that a $10,725 debt owed to him as a result of a Separation Agreement reached in the parties' divorce is a "domestic support obligation" under

§ 101(14A)[1] of the Bankruptcy Code, and therefore a first priority claim under § 507(a)(1)(A). If he were correct, § 1322(a)(2) would require Linda to propose full payment of the debt in her Chapter 13 plan in order for the plan to be confirmable. Chris argues Linda owes him the debt because he paid a debt that was her obligation under the Separation Agreement. Linda questions whether she owes the debt, but argues that even if she does, the debt is a nonpriority property-division obligation that is not covered by § 1322(a)(2). As explained below, the Court concludes Linda has not overcome the prima facie effect of Chris's priority proof of claim as establishing the amount and validity of the claim, but has presented sufficient evidence to overcome his assertion the claim is entitled to priority, and Chris has failed to meet his ultimate burden to establish the debt is a "domestic support obligation" entitled to priority status. Based on the evidence presented, the Court concludes the debt is not a "domestic support obligation" under § 101(14A), so Linda's plan is not required to propose paying it in full.

**FACTS**

While they were married, Linda and Chris filed joint bankruptcy petitions in February 2001 and September 2002. When they filed the 2001 case, they reported Chris was making about $76,300 per year, and Linda was making about $13,300. When they filed the 2002 case, they reported Chris was making about $77,300 per year, and Linda was making about $25,000. In the 2002 case, they also reported Chris had made over

---

[1] 11 U.S.C.A. § 101(14A) (West 2008 Supp.). Unless otherwise noted, all statutory references are to the Bankruptcy Code as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 and are cited to the 2008 supplement to West's United States Code Annotated.

$93,000 in 2001 and Linda had made about $20,400, indicating salaries for both of them had increased during that year. At trial, Chris conceded that he earned most of the income the couple had during their marriage, as much as seventy or eighty percent of it.

Chris filed for divorce in a Kansas state court in July 2004, and a divorce was later granted. As part of that proceeding, Linda and Chris completed a "Separation Agreement" ("Agreement") dated April 19, 2005. As relevant here, the Agreement provided:

> 19. **PAYMENT OF OBLIGATIONS**
>
> In addition to any obligations assumed by the parties as set forth elsewhere herein, the parties agree Husband shall assume and pay those obligations incurred by him separately on or after [a specified date] and shall indemnify and hold Wife harmless from same. Additionally, Husband shall assume and pay those obligations set forth below and shall indemnify and hold Wife harmless for same.
> a) [specified debts related to the marital residence;]
> b) The first $5,400 of the debt owed to the IRS and thereafter one-half of the remaining debt. The parties agree to work together to obtain the best settlement with the IRS to reduce the payment owed;
> [six credit card debts, a debt related to a car owned by his adult son, and a debt to Dell.]
>
> Wife shall assume and pay those obligations incurred by her separately on or after [a specified date] and shall hold Husband harmless from same. Additionally, Wife shall assume and pay those obligations set forth below and shall indemnify and hold Husband harmless for same.
> a) The two Capital One cards in her name; and
> b) Debt to Fred/Frances O'Brien.
>
> The parties further agree that each party shall assume and pay any other obligations incurred by that party and not heretofore referred to in this Agreement or set forth herein.[2]

In another section of the Agreement, Chris was awarded full ownership of the marital residence. The debts owed on it were itemized in that section — they totaled about

---

[2]Debtor's Ex. 5 at 10.

$237,000 — but none of the other debts listed in section 19 were itemized. Although the subsection b) specifying Chris's obligation to pay the debt to the IRS covered only one-half of the debt to the extent it exceeded $5,400, the Agreement included no provision expressly requiring Linda to pay any of the IRS debt referred to in that subsection.

Under the Agreement, Chris was to make bi-weekly payments "as maintenance" to Linda, totaling $1,000 per month, "until the expiration of seven (7) years, death of either party, Wife's remarriage or Wife's cohabitation."[3] Modification of this obligation was expressly allowed if specified things happened in the future, and the payments were to be reported as income on Linda's tax returns and deductions on Chris's returns. Chris was also required to pay Linda an additional $1,000 by a specified date as "a property equalization."[4]

Early in 2007, Chris filed one or more motions to modify some of the financial aspects of the divorce. In May, according to bench notes entered on the state court's docket,[5] the court determined Linda was obliged to pay the part of the IRS debt not made Chris's responsibility by the subsection b) of section 19 of the Agreement that concerned his obligations, although the court gave her a credit against her share of the debt.

---

[3] Debtor's Ex. 5 at 16.

[4] *Id.* at 18.

[5] Creditor's Ex. B. This exhibit was a copy of the state court's docket that was not certified or otherwise authenticated. When Chris offered it as evidence, this Court asked Linda's attorney if he "challenged[d] the accuracy or the authenticity of this document?" The attorney responded that he had no "questions regarding the accuracy of this" or its authenticity. His objection was "[o]nly that it was post-petition." Hearing transcript at 50, lines 9-18. The May docket entry interpreting the Agreement to make Linda liable for part of the IRS debt was made before Linda filed for bankruptcy. The only relevant entry made after she filed for bankruptcy was one determining the amount she owed.

4

Apparently Linda's attorney prepared a journal entry as a result of that hearing; an unsigned, unfiled copy of it was admitted into evidence in this matter without objection. The proposed journal entry says after Chris paid the first $5,400 of the IRS debt, about $33,000 remained due, and that Chris had paid some of his half of the remaining IRS debt. In June, Chris sold the house that had been awarded to him in the divorce, and according to a settlement statement, about $24,300 of the sale price went "[t]o payoff IRS."

Linda filed her current Chapter 13 bankruptcy case on September 25, 2007. About a month after she filed, on October 24, the parties appeared before the divorce court, and according to bench notes for that hearing, "[b]ased on stipulation of parties, court finds that respondent [Linda] owes petitioner [Chris] $10,725 for his payment of IRS debt pursuant to paragraph 19B of the parties' [Agreement]. This is not entered as a judgment because respondent has filed B/R."[6] Linda did not dispute the suggestion made by this note that she had agreed she owed Chris this $10,725. Her attorney did make some effort to prove Chris alone had originally caused the couple to incur the debt to the IRS.

In this bankruptcy case, Linda proposed to pay $200 per month into a Chapter 13 plan. With those payments, she proposed to pay $2,700 to her attorney, about $2,600 to the IRS on a priority debt,[7] and any remaining amount available during the first 36 months of her plan to her general unsecured creditors. The IRS filed a proof of claim

---

[6]Creditor's Ex. B.

[7]She incurred this debt after the divorce, so it obviously is not the IRS debt Chris paid.

5

asserting its priority debt is a little over $2,800. At $200 per month, it would take 27.5 months for Linda's plan payments to cover $2,700 for her attorney and $2,800 for the IRS. If Chris's claim is allowed as $10,725 and is also allowed as a priority debt that she must propose to pay in full through her plan, Linda would have to make between 53 and 54 more $200 payments to supply enough money to accomplish that. Even without deducting the Chapter 13 trustee's fee, then, Linda's proposal to pay $200 per month would not be sufficient to pay those three debts within the maximum time (60 months) that a Chapter 13 plan can run.

**DISCUSSION**

Federal Rule of Bankruptcy Procedure 3001(f) provides: "A proof of claim executed and filed in accordance with [the Federal Rules of Bankruptcy Procedure] shall constitute prima facie evidence of the validity and amount of the claim." Linda does not argue Chris's proof of claim violated any of the rules, so it establishes Chris's prima facie case that she owes him a debt for $10,725. Instead, Linda attacks the claim on two grounds: either she does not owe the debt or, if she does, the claim is not entitled to priority under § 507(a).

*1.    Does Linda owe a debt to Chris for $10,725?*

The Agreement provides a modicum of evidence that Linda might not owe the debt, because it failed to explicitly require her to pay the part of the IRS debt that was not covered by the provision requiring Chris to pay the first $5,400 of the debt and one-half of the remainder. However, the Agreement makes clear the parties were trying to divide

6

all their existing debts between the two of them. The IRS debt was a joint one based on joint tax returns Chris and Linda filed. It seems likely the provision allocating to Chris one-half of the remainder after he paid $5,400 correctly stated what they intended to make him pay, and they simply forgot to include a provision requiring Linda to pay the other half of the remainder. The Agreement contained no express provision requiring Linda to indemnify Chris to the extent he might pay more than his specified share of the debt, but that is immaterial because he would be entitled to contribution to the extent of her share of the joint debt so long as the Agreement called for her to pay part of it. That is how the state court interpreted the Agreement in May 2007, before Linda filed for bankruptcy, and this Court agrees that is the most reasonable conclusion. Linda's suggestion Chris should have to pay the full IRS debt because he caused the couple to incur it in the first place is based on events that occurred before the parties made the Agreement, and she has not claimed that Chris defrauded her by hiding those events from her. When she entered into the Agreement, she waived any right to change its allocation of their debts based on such prior events.

2. *Is Chris's claim a "domestic support obligation" entitled to priority under § 507(a)(1)(A)?*

Although Linda's assertion she should not have to reimburse Chris for any of the IRS debt he paid has failed, her argument Chris's claim is not entitled to priority under § 507(a) is convincing. A party like Chris who alleges his claim is entitled to priority has

7

the burden of proving the claim qualifies for priority status.[8] The prima facie effect of his proof of claim under Bankruptcy Rule 3001(f) might have satisfied that burden in the absence of opposing evidence, but the parties have presented sufficient evidence for this Court to decide whether the claim qualifies for priority.

In 1994, certain debts for alimony, maintenance, or support were made priority debts under § 507(a)(7) of the Bankruptcy Code.[9] For Chapter 13 cases, this brought such debts within § 1322(a)(2), which requires Chapter 13 plans to "provide for the full payment, in deferred cash payments, of all claims entitled to priority under § 507."[10] In 2005, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 created a new name, "domestic support obligation" or "DSO," for alimony, maintenance, or support debts that is broader than the old category.[11] The BAPCPA also modified the treatment of divorce awards in bankruptcy cases in a variety of ways. For example, it increased the priority of DSOs by moving them from the seventh to the first subsection of § 507(a). But the BAPCPA left § 1322(a)(2) unchanged, so Chapter 13 plans must still provide for the full payment of DSOs. Financial obligations imposed in a divorce that do not qualify as DSOs, on the other hand, are not entitled to priority under § 507(a), so a

---

[8]4 *Collier on Bankruptcy*, ¶ 507.1 at 507-10 to -11 (Resnick & Sommer, eds.-in-chief, 15th ed. rev., 2008).

[9]*See* 2 Keith M. Lundin, *Chapter 13 Bankruptcy, 3d Ed.*, § 99.1 at 99-3 to -4 (2000 & 2004 Supp.).

[10]The holder of a particular priority claim can agree to accept different treatment of the claim, but Chris has not done that, so that possibility is not relevant in this case.

[11]Pub. L. No. 109-8, § 211, 119 Stat. 23 (2005).

8

Chapter 13 plan is not required to provide for their full payment. Divorce debts that are not DSOs generally arise from the division of the couple's assets and debts, so the Court will refer to them as "property-division obligations." In this case, the Court must determine whether Linda's obligation to repay Chris her share of the IRS debt qualifies as a DSO that she must propose to pay in full in order for her Chapter 13 plan to be confirmable.[12] In a Chapter 7 case, a non-DSO property-division obligation is not dischargeable even though it is not a entitled to priority, but in a Chapter 13 case, such a debt not only is not entitled to priority but can also be discharged by a debtor who successfully completes a plan.[13]

Before the BAPCPA took effect, a much-litigated provision of the Bankruptcy Code concerning alimony, maintenance, and support obligations was § 523(a)(5), which generally excepted such debts from discharge. Under subsection (B) of that provision, however, a debt was not excepted from discharge if it included "a liability [debt] designated as alimony, maintenance, or support, unless such liability [was] actually in the nature of alimony, maintenance, or support."[14] In *Sampson v. Sampson (In re Sampson)*, the Tenth Circuit explained this language meant bankruptcy courts had to look beyond the label attached to a debt in state court under state law and decide, as a matter of federal

---

[12]The parties have not raised any question about the dischargeability of Linda's obligation on the IRS debt, so the Court will not address it in this opinion.

[13]*See* § 523(a)(15) (excepting property-division obligations from Chapter 7 discharge); § 1328(a) (excepting § 523(a)(5) debts (DSOs) but not § 523(a)(15) debts from plan-completion discharge). A so-called "hardship discharge" under § 1328(b) does not discharge § 523(a)(15) debts.

[14]11 U.S.C.A. § 523(a)(5)(B) (West 2004).

9

law and in light of § 523(a)(5)'s underlying policy to favor the enforcement of familial support obligations over the debtor's ability to discharge debts, whether the parties' intent and the substance of the obligation showed it was actually a support debt.[15] In fact, while the language of former § 523(a)(5)(B) might have been read only to permit the discharge of a debt that had been called "alimony, maintenance, or support" because it was not actually such a debt, the Tenth Circuit also interpreted the provision to mean a debt that had not been called "alimony, maintenance, or support" might be excepted from discharge because it actually was a support debt.[16]

Under the BAPCPA, "domestic support obligation" is defined in § 101(14A) to be:

[A] debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is —
    (A) owed to or recoverable by —
        (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
        (ii) a governmental unit;
    (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
    (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of —

---

[15] 997 F.2d 717, 722-23 (10th Cir. 1993).

[16] *See, e.g., Sylvester v. Sylvester,* 865 F.2d 1164, 1166 (10th Cir.1989) (*per curiam*) (affirming bankruptcy court's finding that obligation was actually in the nature of support even though divorce decree referred to settlement agreement as property settlement); *In re Goin,* 808 F.2d 1391, 1392 (10th Cir.1987) (*per curiam*) (affirming bankruptcy court's finding that obligation was actually in the nature of support even though settlement agreement indicated that obligation represented former spouse's one-half interest in certain real estate).

10

>>(i) a separation agreement, divorce decree, or property settlement agreement;
>>(ii) an order of a court of record; or
>>(iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
>(D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.[17]

Although the language in subsection (B) of the new BAPCPA definition of DSOs is not identical to the language the Tenth Circuit was interpreting in *Sampson*, the new language is consistent with the "actual-support" requirement for alimony, maintenance, and support debts under the prior law: to be a DSO, an obligation must be "in the nature of alimony, maintenance, or support . . . without regard to whether such debt is expressly so designated."[18] A leading bankruptcy treatise says despite the rewording, § 101(14A)(B) retains the scope of former § 523(a)(5)(B), limiting the covered debts to those that are actually in the nature of alimony, maintenance, or support.[19] Courts have similarly concluded case law interpreting former § 523(a)(5) provides persuasive guidance for interpreting § 101(14A).[20] The Court also notes that in a pre-BAPCPA case, *Dewey v. Dewey (In re Dewey)*, the Tenth Circuit Bankruptcy Appellate Panel relied on Tenth Circuit decisions interpreting former § 523(a)(5) to help it decide whether a bankruptcy

---

[17] 11 U.S.C.A. § 101(14A) (West Supp. 2008).

[18] § 101(14A)(B).

[19] 4 *Collier on Bankruptcy*, ¶523.11[5].

[20] *See, e.g., Wisconsin Dept. of Workforce Development v. Ratliff*, 390 B.R. 607, 612 (E.D. Wis. 2008) (citing numerous cases).

11

court permissibly determined that a debt qualified for the alimony, maintenance, or support priority under former § 507(a)(7) so it had to be paid in full under § 1322(a)(2).[21] These authorities convince the Court that the Tenth Circuit's decisions interpreting former § 523(a)(5) should guide determinations whether obligations imposed in divorce cases qualify as DSOs under new § 101(14A) so they are entitled to priority under new § 507(a)(1) and must be paid in full under § 1322(a)(2).

Under former § 523(a)(5), the Tenth Circuit said that in determining whether an obligation was one for alimony, maintenance, or support, or instead a division of property and debt, state law provided guidance, but federal bankruptcy law ultimately controlled.[22] For a debt to be treated as alimony, maintenance, or support — now a DSO under the BAPCPA — it must be shown that: (1) the intent of the parties agreeing to it or the court imposing it was for the debt to be a DSO; and (2) the debt is, in substance, a DSO.[23]

The Court must first, then, determine the parties' intent in creating Linda's obligation.[24] "A written agreement between the parties is persuasive evidence of intent."[25] In *Sampson*, for example, the Tenth Circuit said the agreement involved there provided "compelling evidence" the parties intended the obligation in question to be

---

[21] 223 B.R. 559, 563-66 (10th Cir. BAP 1998).

[22] *In re Yeates*, 807 F.2d 874, 878 (10th Cir. 1986).

[23] *See Sampson*, 997 F.2d at 723 ("The party seeking to hold the debt nondischargeable has the burden of proving by a preponderance of the evidence that the parties intended the obligation as support and that the obligation was, in substance, support.").

[24] *Id*.

[25] *Yeates*, 807 F.2d at 878.

12

maintenance because (1) the obligation was placed in a section labeled "Maintenance (Spousal Support)," (2) it was referred to as "maintenance" throughout the document, (3) the agreement expressly stated the obligation was for support and not in lieu of property division, and (4) the document contained a separate section addressing property division that included an obligation for the maintenance-paying spouse to make a separate cash payment over two years. The Circuit conceded the fact the obligation would survive the recipient's remarriage suggested it was a division of property, but said that was countered by the fact the obligation would terminate on the recipient's death.[26] The Circuit also said a provision precluding modification of an obligation is indicative of a property division.[27]

     Here, the Agreement indicates the parties intended Linda's obligation to be part of their property division, rather than a DSO. Alimony or maintenance obligations are usually, if not always, imposed on only one spouse in a divorce case, so the fact the Agreement contained a section called "Spousal Maintenance" in which Chris was obliged to make payments to Linda that were called "maintenance" and were conditioned in ways typical of true maintenance obligations strongly suggests that none of the payment obligations imposed on Linda in the Agreement were intended to provide maintenance to Chris. The IRS debt was dealt with in a section headed "Payment of Obligations" that assigned duties to pay debts the couple already owed. Of the debts addressed in that

---

[26] 997 F.2d at 723-24.

[27] *Id.*
13

section, only the ones secured by the marital residence clearly concern either party's future support, and the duty to pay those was assigned to Chris, not Linda. The other debts dealt with in that section of the Agreement appear to be ordinary unsecured debts; several years ago, the Court explained its view that the division of existing unsecured debts in a divorce is usually a division of property, not an award of support, unless there is evidence to the contrary.[28] The Agreement does not disclose the amount owed on any of the debts assigned in the "Payment of Obligations" section except the mortgages on the residence and part of the amount owed to the IRS. Debts secured by a marital residence are usually the largest debts a married couple owes, and Chris was directed to pay those. Otherwise, only the sheer number of debts assigned to each of the parties gives any clue that one of them needed support from the other, and since more debts were assigned to Chris, that clue suggests Linda needed support from Chris, rather than the reverse. Finally, none of the payment duties imposed by the "Payment of Obligations" section of the Agreement is conditioned on the death or remarriage of either of the parties, as support obligations typically are, nor are any of them expressed as a duty to make a stream of payments over time, as support obligations usually are. In short, the Agreement itself clearly indicates Linda's obligation to pay part of the IRS debt was a property-division obligation, not a support one.

But the terms of the Agreement do not control the determination of the parties' intent in requiring Linda to pay part of the IRS debt. The Tenth Circuit has also directed

---

[28]*See Cramer v. Cramer (In re Cramer)*, 2003 WL 23777742 at *5 (Bankr. D. Kan. 2003).

the Court to examine extrinsic evidence and surrounding circumstances and decide whether they indicate the parties intended to create a support obligation.[29] In *Sampson*, the Circuit resolved this question by comparing the ex-spouses' job situations, income levels, marketable skills, education, health, and living expenses as they existed at the time of the divorce, which led the Circuit to declare the payee's "obvious need for support at the time of the divorce is enough to presume that the obligation was intended as support even when it is otherwise identified in an agreement between the parties as property settlement."[30]

At the hearing in this case, Chris conceded he earned much more money than Linda did all the time they were married. The documents they filed in their 2001 and 2002 bankruptcy cases showed he made three to five times as much as she did in 2001 and 2002. In their 2005 Agreement, he was given both their home and the duty to pay the mortgages against it, yet was also required to make bi-weekly "maintenance" payments to Linda for seven years. Except for the itemization in the Agreement of the mortgages against the home, the parties presented no evidence about their relative living expenses in 2005. The circumstances shown by the evidence before the Court clearly establish that Chris did not need financial support from Linda when they made the Agreement; instead, Linda needed support from Chris. Since both the Agreement and the circumstances at the

---

[29]*Sampson*, 997 F.2d at 725; *Yeates*, 807 F.2d at 878.

[30]*Sampson*, 997 F.2d at 725; *see also* 4 *Collier on Bankruptcy*, ¶ 523.11[6][b] (parties' financial situation at time of divorce may be most important factor affecting support-versus-property-division question).

15

time of the parties' divorce indicate the parties did not intend for Linda's obligation to pay part of the IRS debt to be for Chris's support, the Court concludes Linda's obligation does not qualify as a DSO.

For an obligation to be one in the nature of support under former § 523(a)(5), the Tenth Circuit declared not only that the parties must have intended the obligation to be for support, but also that the obligation must, in substance, be support.[31] Even if the Court had concluded the parties intended to create a DSO, the Court could still not conclude Linda's obligation to pay part of the IRS debt qualified as a DSO without determining the debt was, in substance, support for Chris. In *Sampson*, the Circuit said, "The critical question in determining whether the obligation is, in substance, support is 'the function served by the obligation at the time of the divorce.'"[32] Like the question of the parties' intent, this requires considering the parties' relative financial circumstances.[33] The Circuit pointed to several of its prior decisions as indicating that when the debtor's obligation effectively functions as the former spouse's source of income at the time of the divorce, it is, in substance, a support obligation.[34]

In this case, the income disparity of the parties at the time of the Agreement is not disputed. Chris conceded he earned much more money than Linda throughout their

---

[31] *Sampson*, 997 F.2d at 725.

[32] *Id*. at 725-26 (quoting *In re Gianakas*, 917 F.2d 759, 763 (3d Cir.1990)).

[33] *Id*.

[34] *Id*. at 726.

16

marriage. The problem for him is this means Linda's obligation to pay part of the IRS debt did not function as his source of income at the time of the Agreement. Instead, the obligation was imposed simply as part of the process of dividing their debts, which constituted negative assets being divided along with the rest of their property. Any remaining thought that Linda's obligation to pay part of the IRS debt was to provide Chris with support is overcome by the fact he was to pay her bi-weekly payments of "maintenance" for seven years. Consequently, Linda's obligation is not in the nature of support, and does not qualify as a DSO under § 101(14A) or a priority debt under § 507(a).

**CONCLUSION**

For these reasons, the Court concludes that Chris's claim for reimbursement of $10,725 of the money he paid on the IRS debt is an allowable claim against Linda's bankruptcy estate, but that Chris has not met his burden of showing that claim is a priority DSO. Instead, the obligation is an ordinary unsecured debt, and Linda's Chapter 13 plan does not have to provide for full payment of the obligation in order to satisfy § 1322(a)(2). The Clerk's Office is directed to set this case for a hearing on the next appropriate Chapter 13 confirmation docket.

# # #